The next case on the calendar this morning is METLAKATLA INDIAN COMMUNITY v. Dunleavy. I see two counsel on the screen. If you can hear me, would you please raise your hand? All right, we've got two hands raised. We have read your brief. We look forward to your arguments. We've set it for 15 minutes aside. When you're ready, counsel, I think it's you first, Ms. Weiss. Good morning, Your Honors. Attorney Julie Weiss representing the METLAKATLA INDIAN COMMUNITY, the appellant in this Indian fishing rights case. May it please the Court, I would like to reserve three minutes for rebuttal. Okay, we'll try to help you, but keep your eye on the clock. Thank you. Your Honors, the community is a federally recognized Indian tribe whose reservation, the Annette Islands Reserve in Southeast Alaska, was created by an act of Congress in 1891. The community is here today asking the Court to reverse the district court's dismissal under Rule 12b-6 of the community's amended complaint, which sought judicial recognition of the tribe's implied right to fish in certain off-reservation waters. Your Honors, reversal is warranted because the community presented the district court with a more than plausible claim for relief. The district court erred in three main ways that are interrelated. First, by failing to review the community's allegations through the lens of the trust relationship that governs the United States' obligations towards a dependent Indian community. Second, the district court erred by failing to apply relevant Indian canons of construction. Third, the district court failed to draw all reasonable inferences in the community's favor, which runs afoul of both the Rule 12b-6 standard and the Indian canons of construction. The foundation for these errors was the court's determination that the Metlakatla Indian community is unlike all other Indian tribes, such that the body, the well-established Indian law jurisprudence does not apply to them, and that is error. Ms. Weiss, here's a fundamental question for me. We're quite accustomed to treaties in which off-reservation fishing or other off-reservation activities are explicitly mentioned and preserved as part of setting up the reservation. I mean, that's the centerpiece of all the litigation of the fishing rights around Puget Sound in the treaty signed by Stevens with the tribes. Here, we have no such thing. What we have is a statute that refers, but the only word we've got is use. I'm looking at Judge Wright's decision in the Chehalis tribe case where he writes, and I'm now on page 3452. Judge Wright writes, the question here is whether executive orders issued before Washington became a state contained off-reservation fishing rights. In considering this question, we must keep in mind that the specific purposes of executive order reservations were often unarticulated. To identify these purposes and the rights associated with them, we must consider the executive orders themselves, the circumstances surrounding their creation, the history of the Indians for whom they were created. So, what are the circumstances that we should look to because, as I read it, we have what I think should be analyzed in the same way as an executive order creating it. We have a treaty. We have a statute creating it. In other words, under executive order reservations and statutory reservations, we don't have a negotiation. We don't have a treaty. So, what are the circumstances that Judge Wright in the Chehalis case would have us look at? Well, Your Honor, in Chehalis, the court actually held that explicit language is not required for a finding of implied Indian rights. That's the language I just read you. So, now I'm asking you, okay, so what are the circumstances that Judge Wright tells us we should be looking to? Yes, Your Honor. The court indicated that we should look at the circumstances of the reservation's creation and the history of the people for whom the reservation was created. And in this case, Your Honor, the facts alleged in the community's complaint and the inferences drawn therefrom demonstrated that an Indian in southeast Alaska more than a century ago could not have conceived of an invisible line around the reserve beyond which it could not fish. Nor is it conceivable in 1891 that Congress, which the congressional record tells us was well acquainted with the history of its fishing people, would have intended to limit the community's fishing access to essential fishing grounds that were necessary for its survival. The key historical fact, Your Honors, is that Congress reserved an island homeland in southeast Alaska where aquatic natural resources were abundant but arable lands were not. And it did so for an Indian fishing people for the purpose of establishing a sustaining community. That is the purpose of the trust relationship. So what were the fishing practices of this community before the creation of the reservation, at the time of the creation, and thereafter? What were they doing? What were the circumstances? Yes, Your Honor. Typically, they fished within a day's travel from the reserve, from the Annette Island. They had come to the Annette Islands shortly before in 1887, before the actual statute creating the reserve in 1891. And if you look at ER 54, we actually indicated on a map a series of places that the evidence showed members of the community had historically fished. And those were typically all within a day's travel of the reserve. As I look at that map and the testimony we've gotten, the evidence, it sounds as though they fished up to 35 to 50 miles away from the reservation as a matter of routine. Is that right? That's correct, Your Honor. And if you look at Metlakatla itself and the Annette Islands, you see that it is a very small island in the middle of a very large body of water. So if you look also, Your Honors, at ER 47 and ER 46, and I'll just show you on the screen, this is a very large body of water, and the yellow indication there is the community. It is surrounded by water on all sides, and the community typically fished far beyond reserve waters. It was necessary to do so to survive. In fact, Your Honors, if you look at the Alaska Pacific Fisheries decision, particularly the Territory of Alaska's decision, the court stated, Congress must be held to have known that without the food yield of the sea, these Indians could not survive there being little or no agricultural land on the islands, or for that matter, in all southeastern Alaska. So it begs common sense to think that Metlakatlans would have believed otherwise in 1891. And the belief of an Indian tribe as to the rights flowing from a reservation is a very important factor to be considered under the Indian canons of construction. Also, Your Honors, the Supreme Court instructed in Iqbal that common sense has to play a role in a court's decision on a motion to dismiss. And in this case, where we have historical facts dating back more than 130 years, common sense is important. And it begs common sense to think that the community would have chosen the Annette Islands or desired to have a reservation in the middle of the waters of southeast Alaska if it was somehow constrained in its fishing abilities. Your Honors, I do think that you're correct, Judge Fletcher, that the Chehalis case is what provides the legal framework for the decision here. And of course, it flows from this court's Colville decision, another implied rights case. That one involved water as opposed to fish. And in Colville, like in many of these cases, the court said, well, we have to look at what was the purpose of the reservation. And in that case, it was to allow the tribe to continue to be an agrarian society. And to be an agrarian society in arid eastern Washington, water rights had to be available. Was the Colville Reservation a treaty-based reservation or executive or statute? How was the reservation established? Your Honor, I believe the Colville Reservation was, Your Honor, I believe it was executive order, but I'm not sure about that. And I apologize. Well, we can check. Okay. Yes. And then Colville actually relied on winters. And winters held that implied reserved rights flow from the purpose of a reservation. So similarly, in winters, the court said, well, the government's purpose in creating this reservation, the Fort Belknap Indian Reservation, was to give the Indians a permanent place to live where they would give up their prior lives as nomadic hunter-gatherers and turn instead to agriculture. And to achieve that purpose, it would have been impossible to do so on the arid plains of eastern Montana if water wasn't available. So again, the purpose was key to that determination. And so here, Your Honors, you have Indian peoples who historically relied on fishing. They are always tied to fishing in terms of cultural, spiritual, and sustenance purposes. And they were living on an island where there was no arable ground. And, Your Honor, it's simply inconceivable to think that the Indians believed, or the Congress believed, that they should be limited in their ability to go off-reservation to fish for the sustenance that they needed. Unless Your Honors have further questions, I think I will reserve the rest of my time and simply ask the Court to affirm, excuse me, to reverse the District Court's determination and remand the matter. The community simply wants an opportunity to go back to the District Court and to present this case on the merits and demonstrate to the District Court that it has an implied right to fish off-reservation under federal law. Now, if we were to remand, if we were to agree with you and to remand, what would then be open? The extent of the fishing rights, the degree to which the Indians can fish in common with or in exclusive, I mean, the scope of the right is not, that would be determined if we win, if you win and we remand? Yes, Your Honor, the District Court felt that it was inconceivable that this right could even exist. So, in doing so, it's important to recognize, in doing so, the District Court took two competing inferences. There was an inference by the state and there was an inference by the community as to what the historical evidence indicated, and the District Court chose to go with the state as opposed to giving the reasonable inference of the benefit of the doubt to the tribe. So, the question on remand would be the scope of the right? That's right, Your Honor. But, counsel, the tribe is not asserting an exclusive right, is it? No, Your Honor, the tribe is not asserting an exclusive right. This would be a right exercised in common with others. Okay, let's hear from the state. Ms. Wolfe? Good morning, my name is Laura Wolfe, and I'm representing the Alaskan defendants. Metlakatlin community members, just like other Alaskans, have a right to fish in state waters, subject to generally applicable state law. Now, one of the regulations, and this is the one that's issued in this case, is the state's limited entry program. The program limits the number of people who can fish in any given area to prevent overfishing. And when this program was started in the 1970s, the state gave out free permits to fishermen who historically fished in state waters. Some Metlakatlins got fishing permits this way, those who met that criteria. Now, almost 50 years later, the community asserts that it doesn't have to comply with the state's limited entry program. I just want to make clear that opening up the limited entry program would derail the conservation purposes. The community... Now, why would it derail the conservation purposes? So, the way that the state conserves... This particular issue is not under review, but I just want to mention it because it helps frame what the scope of the right they're looking for is. It would derail it because the way that the state's program works is it limits the number of people who can fish in state waters, and then the state has these openers, basically, and they say... Let me ask the question in a different way. It may derail this particular program, but I don't think it would disable the state from regulating for purposes of conservation. If you look back at the Puyallup tribe case coming out of the 70s, the Supreme Court says that the state can regulate for the purposes of conservation. It may be that if this tribe wins, it would have more rights than it now has under the current program, but you could regulate them for purposes of conservation. So, there's a difference between a permit for a fee to get money and just to fund a Department of Natural Resources, for instance, and a permitting program limiting the number. That is the way the state conserves its resources. That's the way the state conserves it under the current program. Let me ask you a question with respect to the passage I read from the Chehalis tribe case. Sure. Judge Wright writes for our panel that we treat executive order reservations and the construction of the language creating the reservation differently from the way we treat treaty reservations. Should we treat a statutory reservation comparably to the way we treat an executive order reservation, or should we treat a statutory reservation like a treaty reservation? We should treat them differently. And I just want to be clear that there's... No, wait, wait, wait. Treat what differently, treat what the same. Exactly. Okay, so to be clear, what the state is not saying first, and then I will say what the state is saying. It's not saying certain reservations and there's a hierarchy of reservations. I'm saying we treat executive orders differently than we treat statutes. That's just one thing that's different. We treat the interpretation... For instance, executive orders have a singular intent by a singular person, the president, right? So maybe when we're trying to focus on, well, what is the purpose of presidential intent? It's the purpose of... It's the focus of one person. When we're trying to figure out the purpose of a statute, that's hundreds of legislatures coming together to create a compromise. That's why we want text. That's why we want at least some kind of textual hook. Let me give you the reason why I think I disagree with you. Okay. A treaty comes out of negotiation between the government on one side, sometimes it's a territorial government, sometimes it's the federal government, but negotiations between the tribal entity and the governmental entity, and then they draft up language. And we're very familiar with lots of treaties that are very specific about things, such as my example for fishing in the Northwest is the treaties around Puget Sound in which off-reservation fishing was specifically included, indeed insisted upon by the tribes as necessary for their survival. The reason why we don't have the same rules of construction for an executive order is that the executive orders tend to be very short. They're not the product of negotiation. Well, a statute, this statute in particular, is just like an executive order in that sense. It's very short. It's not the product of negotiation. And the only word that gives us any hint is the word use. So in that sense, why do we treat – I have trouble understanding then why in terms of interpreting what is meant by the statute, we should treat the statute for purposes of interpretation different from the way we treat executive orders. So I think I just gave you one example. Here's another example. But also, even if you want to have the Chehalis framework apply to this case, I think the district court's decision should still be affirmed. But I don't think that – I think just as a matter of law, it would be better to have Chehalis not apply because I think that's the correct rule of law that it doesn't apply. And another reason is, for instance, a lot of times when you have – and this is just, again, it's not an executive order reservation and a statutory reservation as much as I'm just saying that executive orders are treated differently when we interpret them than statutory interpretation. So help me understand why you say Chehalis should not apply. So here's another reason. So if you look at the cases that Chehalis comes from, if you look at interpreting executive orders, an executive order sometimes, often, like in the case of United States versus Caperta Devil's Hole Monument case, an executive order is made pursuant to a statute. So you have more information from the legislature and you have – if the purpose is not clear because it's short, you have something to go on beyond that. In this case, we don't have anything in the text. The text is completely silent. And I think in this case – I mean that's the problem for the state as I view it. The text isn't silent. The only word it uses is use. Well, first of all, use modifies the reservation, not outside the reservation. And the normal rule is absent express federal law to the contrary. Indians going beyond reservations are subject to generally applicable laws. That's miscalero. That's the normal rule. Chehalis is a carve-out for executive orders or executive order reservations. The normal rule is miscalero. And I think one thing to think about, I think the case does not hinge on the canons of interpretation by any means, but I think it's really important to know why the canons actually don't help us in this case. So the canons instruct us to liberally construe statutes in favor of Indians when there's a textual ambiguity. In treaties and executive orders, creating reservations must be interpreted as the Indians understood them when there's doubtful expressions. It's about ambiguities. Here, there's no ambiguity. There's silence. And I think this court can look at Oregon Department of Fish and Wildlife. Again, I'm looking at Chehalis, and I take your point that you don't think we should treat executive order reservations in the same way we treat statutory reservations. Assuming for the moment that we do, what Chehalis says is the specific purposes of executive order reservations are often unarticulated. It doesn't say ambiguous. It says unarticulated. It doesn't say not mentioned. Okay. Well, with that, I'd like to turn, for instance, to one case that was silent and the purpose was, well, the case was silent about fishing rights. I don't know if we'd call that unarticulated, but completely silent. This is a U.S. Supreme Court case. This is Oregon Department of Fish and Wildlife versus Klamath. And the issue in that case was whether the tribe retained a special right to hunt and fish on ceded land free from state regulation. The court said the agreement at issue was silent with regard to hunting and fishing rights. And in that case, the party stipulated to the fact that tribal members fished on ceded lands from the time of the treaty until the commencement of the litigation, that the state never regulated those lands, that fishing was critical to the tribe's survival at the time of the treaty making and also important during the litigation. And the tribe said, well, the singular purpose of the agreement was to benefit the Indians. So we should just use the Indian canon to construe an unarticulated purpose as saying we have off-reservation fishing rights. And the Supreme Court said no. But of course that was a treaty case. We're construing a treaty in which there was negotiation. There was a written treaty spelling out the agreement. Here we do not have a treaty. You're right. Here we do not have a treaty. I don't think that that is much different. I think the only thing that helps us, if anything, that there's no— the reason that this helps us is because, well, if you look at the water rights cases and also the retained right cases, the only time— first of all, there has never been a case where without a textual anchor, even an ambiguous textual anchor, any court has ever found off-reservation fishing rights. So this would be just beyond the pale of anything within Indian canons, period, number one. Chehalis left open the door for a possibility that a lack of a textual anchor is not dispositive of not finding off-reservation fishing rights. What happened in Chehalis is that as to the two tribes at issue, the Chehalis and the Shoalwater tribes, the court found, the district court found and the court of appeal agreed, there was simply no evidence that the Indians had any use or expectation off the reservation on the fishing rights at issue. That's why the tribes lost there because there was no practice. There was no expectation. Here, tell us. No, that's actually not true, Your Honor. With all due respect, they were a fish-eating people, and the Shoalwater tribe, they said, we're fish-eating people. We have fished, and they're actually were executive. What they were asking for was sharing the fishing rights with the Quinault tribe, and there was no evidence that they had done that or that they expected that. So I think one thing to keep in mind, what the community is asking for here, and this is why I started with what the limited entry program is, they're not asking just to share fishing. They're asking for a priority. It's very clear that that is the scope of what they want. They want a priority. If they wanted to say, well, first of all, this is non-discriminatory, and the Alaska Supreme Court. They want something like the tribe's God in Puget Sound. Whether they get that or not, I don't know. But that's something like that. Yes. So just to be clear, what they want is they want a right that's prioritized among other fisher people. Did I understand you to say that this program has been in effect since the 70s? Correct, since 1973 or 1974. Why is this challenge coming up now? So for the most part, just if you look at historical records of fish, there's been enough fish. So the community has an exclusive right to fish in the reserve, and the reserve includes a large amount of water 3,000 feet out around the islands. There's been enough fish for a while. Last year was an amazing year. It was, I think, the best year ever for the Metlakatlins fishing within the reserve. But before that, for like five, six, seven years before that, the fishing returns have been really low. There's climate change. There's other reasons, perhaps. And when I say fishing, I'm sorry, I'm talking about pink salmon fishing, which is the biggest staple. There's a lot of different species of pink salmon. There's a lot of different types of fish we're talking about, but I think the forefront is probably pink salmon. I want to briefly discuss why water rights cases and retained rights cases are really dissimilar, and those cases are dissimilar. One, the water rights cases are talking about water rights, not fishing rights, not logging rights, not hunting rights. They're also talking about on-reservation water rights, not off-reservation water rights. And that's a big distinction, saying that we're going to think about a purpose that's completely unarticulated that has to deal with something off-reservation. Now, the on-reservation, there's a little caveat for on-reservation water rights, and that's when there's an arid land reservation where there's water adjacent on one side, like a river or a lake or something. Other than that, it's all water on a reservation. And when we talk about the community sentence reply, no, no, no, we're actually talking about off-reservation, that's false. We're talking about off-reservation uses which are impeding on reservation rights. That's one reason why those cases are really inapposite. The second type of case that's quite inapposite, and this goes to Judge Fletcher, your talks about negotiations, are retained, the history, to the extent that you want to look past the text, that there's just nothing in the text whatsoever, there's nothing in the congressional record, and the history of negotiations is that with retained right cases, we're talking about a tribe being a grantor, having a bundle of rights, including aboriginal rights, on ceded lands, and then what they retain. That's not the case in this situation. The history in this situation is what rights the federal government or Congress granted to the tribe, and that's just a different context. Of course, and we have a fair number of reservations that are created, as it were, out of cold cloth where the tribe is not retaining rights, but the tribe has moved off its historic lands, which in this case is a version of that. I would say this case is a far cry from a version of that. In those cases, tribes have been moved off their lands, but they had rights to begin with, and then they had to be moved and then moved again. I see my time is up, so I just want to recap really quickly that dismissal was warranted here because the undisputed facts and the community's allegations, the community alleges that Congress meant to create a self-sufficient community, Congress knew Metlakatlan's fished within and outside the reserve, and that fishing is important to them, and these facts, these don't add up to the legal conclusion that the Act created an off-reservation right when the Act is completely silent as to that right. Thank you. Thank you. Ms. Weiss, you have reserved some time. You're muted. Apologies. Your Honors, this Court has long held that when it comes to protecting tribal rights against non-federal interests, it makes no difference whether those rights derive from treaty, executive order, or statute that is in the Parabono case. So you're absolutely right, Judge Fletcher. There is no difference. Chehalis certainly is not a car lot. Wait a minute. My argument or question was there is a difference in terms of how you interpret it. That is to say if it is an executive order or a statute, we will find unarticulated rights sometimes, but if it's a treaty, I'm not sure we will. You may be right about that, Your Honor. And here, of course, what we're talking about is statute, and the case that gives the legal framework is executive order. So that's what we need to worry about. And Chehalis is not a carve-out in any respect. It flows directly from implied rights cases dating back to Winters. And actually, Your Honors, the fact that it is not a carve-out can be found in the Alaska Pacific Fisheries decision, the Supreme Court's decision in 1918. The language there very much mirrors that in Chehalis. There, the court was upholding the legality of the 3,000-foot fishing zone around the reserve, and the court considered, quote, the circumstances in which the reservation was created, the power of Congress in the premises, the location and character of the islands, the situation and needs of the Indians, and the object to be obtained. So essentially, Your Honors, Chehalis, that legal framework, can be traced all the way back to the 1918 Alaska Pacific Fisheries decision, which involved the community, the Mountain Catholic Indian community. I'm curious about that, if the case set aside the 3,000 feet. If there were an implied right, why wasn't that included in the set-aside? Your Honor, the discrete issue before the case was the legality of the exclusive fishing zone. The community actually was not a party to that case, and the issue of implied rights did not come up. This court in the Ninth Circuit decision actually recognized that it was not dispositive as to the extent of the community's rights. And so here, what the community seeks is an opportunity to determine the extent of its off-reservation fishing rights. I'll ask you the same question I ask opposing counsel. If this program has been in effect since the 1970s, why is this issue just being brought by the tribe? Yes, Your Honor, it is largely resources and practicality. The tribe does not have an abundance of monetary resources to spend on litigation given the many needs of its community members. And it is a very practical tribe and has always done the best to make do with what it has. But as fishing declined, as the abundance of fish in the reserve declined, so much so that in 2018, Your Honor, for the first time in over 100 years of continuous operations, the community's fish packing plant shut down. It was a tremendous blow to the community. Under those circumstances, it became essentially necessary to pursue these rights to ensure the tribe's survival. So, you know, as far as derailing the conservation purposes, Your Honor, the tribe is committed to the conservation of these species. These are the species on which it does and has always depended. And I am confident, I don't know how it would work, Your Honors, but I am confident that all of the parties involved, the state, the community, the Department of Interior, could put their smart minds together and find a way to further the conservation of species and equitably resolve this issue. Do you have a position as to whether or not the state can regulate for purposes, let's assume for a moment, this is an assumption, but I'm going to make a simple-minded assumption that we agree with you that there is an off-reservation right to non-exclusive fishing and that after remand, the district court follows Judge Bolt's example and decides that means 50-50 of the harvested fish within the area of the fishing in common. With that framework, do you contest the right of the state, if push comes to shove and the fish are scarce, to limit Indian fishing for purposes of conservation? No, Your Honor, it's well established that a state can limit fishing rights for purposes of conservation. What it can't do is qualify... Indian fishing rights? Yes, Indian fishing rights can be limited for conservation purposes. For example, in Puyallup Tribe 391 U.S., at pages 398-399, that is discussed. But it has to be a sound conservation purpose, Your Honor, not a qualification or condition that is related to... discriminates against a tribe. So I see I'm out of time, and unless the court has further questions, I would again ask the court to reverse the district court and to remand the matter so that the tribe may pursue its claim for implied off-reservation fishing rights on the merits. Okay, any further questions from the bench? No. Okay, thank both sides for your helpful arguments. The Bentley-Contley Indian community versus Dunleavy submitted for decision. And that finishes our oral arguments for this morning.
judges: Fletcher, Rawlinson, Owens